Douglas SPIES a/k/a Gunaratna Sarika Plaintiff–Appellant,

v.

George V. VOINOVICH, Reginald Wilkerson; Marloe H. Karlen; John D. Morgan; and Leonard Hawley Defendants/Appellees.

No. 00–4015.

United States Court of Appeals, Sixth Circuit.

Sept. 30, 2002.

Before BOGGS and MOORE, Circuit Judges; and RUSSELL, District Judge.*

RUSSELL, District Judge.

This is an appeal of a First Amendment retaliation claim brought by the Plaintiff, Douglas Spies n/k/a Gunaratna Sarika ("Sarika"), against various Ohio prison officials. Sarika contends that officials at the North Central Correctional Institute ("NCCI") violated his rights guaranteed under the First Amendment by retaliating against him for filing lawsuits against the prison officials. Sarika requested injunctive relief, and the case was tried before the district court without a jury. Because we conclude that the district court abused its discretion in refusing to rule on Sarika's motion to supplement his pleadings, we must again REMAND this action to the district court.

## BACKGROUND [2]

Sarika, while incarcerated at NCCI, became an ordained Zen Buddhist in December 1994. Following his ordination, Sarika sought various accommodations from prison officials at NCCI to further his practice of the Buddhist religion and to allow other inmates to join with him in practicing Buddhism. Initially, Chaplain Leonard Hawley ("Chaplain Hawley") [3] and the other Chaplains at NCCI provided various accommodations to Sarika and assisted him in his desire to recruit other inmates to the Buddhist faith. These included storing certain religious articles in the Chaplains' office, allowing Sarika to meet once a week with his fellow Buddhist(s) to meditate and chant, assisting Sarika in placing a telephone call to a Buddhist temple in California so other inmates could be ordained as Buddhists, and attempting to locate a local Buddhist temple with a prison ministry to provide someone to lead Buddhist services at the prison for Sarika.

However, the prison did not provide certain requested accommodations to Sarika. Sarika sought to obtain a strictly vegan diet from the prison, but was only provided a vegetarian diet.[4] Also, at the time of the filing of his initial action, NCCI refused to recognize "Sarika" as his actual name. Sarika further protested the fact that NCCI had not provided group religious services for him with an outside religious leader, and that he had not received necessary religious texts and artifacts. Sarika filed suit regarding these issues on December 15, 1995.

Nevertheless, Sarika continued to pursue internal prison procedures to obtain the necessary relief, especially the ability to worship in a group with an outside religious leader. In a letter written to

---

* Honorable Thomas B. Russell, United States District Judge for the Western District of Kentucky, sitting by designation.

2. Additional facts relating to this action may be found in the court's previous opinion involving this litigation, *Spies v. Voinovich*, 173 F.3d 398 (6th Cir.1999).

3. Chaplain Hawley is a Defendant in this action, along with Reverend Marloe H. Karlen ("Reverend Karlen"), who was the Religious Services Administrator for the Northern Region of Ohio for the Ohio Department of

Rehabilitation and Correction. Otherwise stated, Reverend Karlen was the chief religious officer for all of the state prisons in the northern portion of Ohio.

4. Prison officials contacted the International Buddhist Meditation Center in Los Angeles, California, in an attempt to determine whether Buddhism requires a vegan diet. The officials learned that veganism was not a required tenant of the Buddhist faith.

Reverend Karlen on January 23, 1996, Sarika rhetorically asked "must I take these issues into federal court, Reverend Karlen?" [5] Sarika, in his letter to Reverend Karlen, requested recognition for his new Buddhist name, accommodation of his vegan dietary needs, and allowance of group Buddhist meetings with an outside religious leader.

Reverend Karlen convened a meeting with Chaplain Hawley, the other Chaplains and certain administrative staff (including Warden John D. Morgan ("Warden Morgan"), who is a Defendant in this litigation) at NCCI on February 8, 1996. At the meeting, Reverend Karlen read to the assembled prison officials the letter written by Sarika on January 23, 1996. Warden Morgan reprimanded Chaplain Hawley for arranging the telephone call to California and for storing religious items for Sarika, as both actions violated NCCI policies. The officials also took note of the fact that Sarika actively participated in the prison grievance process on behalf of himself and other inmates in seeking expanded privileges. The prison officials disapproved of inmates acting in such leadership capacities, but no one present at the meeting overtly communicated this to Sarika.

Also at the meeting, the officials discussed the so-called "rule of five." This well-known rule at NCCI provided that unless a religious group could claim five members interested in conducting a group service, the group was not entitled to meet together in the prison chapel. Reverend Karlen and Warden Morgan directed that this rule be enforced by the Chaplains

against Sarika and his fellow Buddhists since they did not meet the required numerical threshold. The prison officials directed Chaplain Hawley to communicate the results of the meeting to Sarika.

Reverend Karlen sent a letter to Sarika on March 15, 1996 (approximately one month after the Defendants were served with notice of his legal action) outlining the position of NCCI. Chaplain Hawley then met personally with Sarika on March 25, 1996, to discuss the decisions. He informed Sarika that the Buddhists could no longer meet as a group, but were free to meditate privately in the chapel.[6] Chaplain Hawley further informed Sarika that he could no longer keep the religious items in the Chaplains' office, nor could Sarika maintain the items in his cell due to security concerns. Sarika declined an invitation by Chaplain Hawley to donate the items in question to NCCI (which would have allowed them to remain in the chapel).

In December of 1996, Sarika filed a grievance alleging that an excessive amount of noise in the chapel prevented him from meditating. In his grievance, Sarika noted that other Buddhists were present in the chapel during the incident in question. Chaplain Hawley noted in responding to the grievance that as per his meeting with Sarika on March 25, 1996, Buddhists could not assemble in the chapel, and that in so doing, Sarika had violated the policies set forth by the prison. Chaplain Hawley warned Sarika not to violate the policy in the future.

A second Buddhist inmate filed a grievance in December, 1996, pertaining to the

**5.** Reverend Karlen and the other Defendants had yet to be served with the December 15, 1995, complaint, and the district court found that the Defendants were unaware of the lawsuit until service of process, which occurred in mid-February 1996. The record indicates that only Chaplain Hawley and Chaplain Victor Marshall were served as Defendants in the initial lawsuit.

**6.** There is some allegation in the record that other groups were allowed to conduct group meetings without the required five persons, but little evidence that this actually occurred.

ban on the Buddhists assembling in the chapel. In responding to the grievance, Chaplain Hawley noted that "[d]ue to pending litigation involving Buddhist practices, those who are recognized as Buddhists are not permitted to assemble in the activity area." The inmate "appealed" the grievance to the institutional inspector, who responded in a similar fashion: "[i]t was concluded that due to pending litigation the situation, the proper avenue is to have the current practices remain the same until the conclusion of the litigation."

On March 26, 1997, a fifth inmate at NCCI professed his interest in group Buddhist services. Warden Morgan responded by allowing the Buddhists to meditate as a group in the chapel. He also indicated that NCCI was "attempting to obtain a volunteer Buddhist Monk to serve as a spiritual leader since there are now five or more inmates requesting such services." Nevertheless, Warden Morgan did not allow the Buddhists to resume their chanting and other group practices in which they had engaged prior to March of 1996. He noted that "[h]owever, as you are aware, we are currently involved in litigation on these very same issues." Finally, the prison officials rejected a request in January, 2000, from the outside spiritual leader of the Buddists at NCCI to add an additional spiritual leader "because of the efforts that were going on at a settlement in this particular case, it had been decided that things should stay as they were. In other words, no additional activities other than those what we already had been doing should take place at that time until some resolution had come about."

Sarika filed the instant action on April 23, 1996, against Chaplain Hawley, Reverend Karlen and Warden Morgan (along with other individuals who were dismissed prior to this appeal), alleging that the prison officials had retaliated against him for filing the initial lawsuit. The district court dismissed the original action and this one on summary judgment motions filed by the Defendants, after the Supreme Court declared the Religious Freedom Restoration Act unconstitutional in *City of Boerne v. Flores,* 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). On appeal to the Sixth Circuit, this court upheld the dismissal of the first action, but remanded the instant case for a determination on the merits of the First Amendment retaliation claim in light of *Thaddeus–X v. Blatter,* 175 F.3d 378 (6th Cir.1999) (en banc). *See Spies,* 173 F.3d at 407.

On remand, the district court denied two motions for summary judgment filed by the Defendants, and allowed the matter to proceed to a bench trial. In evaluating the three-factor test set forth in *Thaddeus–X,* the court concluded that Sarika had demonstrated both that "the plaintiff was engaged in a constitutionally protected activity" and "that the defendant's adverse action caused the plaintiff to suffer an injury that would likely chill a person of ordinary firmness from continuing in that activity" but had not shown "that the adverse action was motivated at least in part as a response to the exercise of the plaintiff's constitutional rights." *Thaddeus–X,* 175 F.3d at 397. The district court concluded the decisions both to ban further group meetings of the Buddhists and to confiscate the religious items held by Sarika stemmed from the enforcement of prison regulations based on legitimate penological interests, not retaliation for filing the original lawsuit. The court below also concluded that

> [s]ubsequent references to the pending litigation appear to have been motivated by a desire to maintain the status quo during its pendency. In any event, to the extent that those statements were offered as post-hoc evidence of retaliato-

ry motive under Fed.R.Evid. 404(b), I do not find them to be indicative of improper motive at the time plaintiff's religious activities were curtailed.

Sarika now appeals to this court, arguing that the district court erred in its ultimate conclusion. According to Sarika, the conduct of the various Defendants indicates that the continuing restrictions placed on Sarika and his fellow Buddhists amounts to retaliation for Sarika's constitutionally protected litigation activity. He focuses on the occasions where prison officials referenced the pendency of this action as a reason for justifying NCCI's stance on regulating the activities of the prison Buddhist community. The Defendants contend that the district court erred in finding that Sarika met the first two factors of the *Thaddeus–X* test, but correctly ruled that he failed to meet the third prong of the test.[7]

## STANDARD

A retaliation claim essentially entails three elements: (1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two— that is, the adverse action was motivated at least in part by the plaintiff's protected conduct.

*Thaddeus–X,* 175 F.3d at 394 (citing *Bloch v. Ribar,* 156 F.3d 673, 678 (6th Cir.1998)); *Lewis v. ACB Business Services, Inc.,* 135 F.3d 389, 406 (6th Cir.1998); *Penny v.*

*United Parcel Service,* 128 F.3d 408, 417 (6th Cir.1997); *Yellow Freight System, Inc. v. Reich,* 27 F.3d 1133, 1138 (6th Cir.1994). "Once the plaintiff has met his burden of establishing that his protected conduct was a motivating factor behind any harm, the burden of production shifts to the defendant. If the defendant can show that he would have taken the same action in the absence of the protected activity, he is entitled to prevail on summary judgment." *Thaddeus–X,* 175 F.3d at 399 (citing internally *Mount Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)).

"It is well established that prisoners have a constitutional right of access to the courts," *Thaddeus–X,* 175 F.3d at 391 (collecting cases), as well as "an undisputed First Amendment right to file grievances against prison officials on his own behalf." *Herron v. Harrison,* 203 F.3d 410, 415 (6th Cir.2000) (citing *Noble v. Schmitt,* 87 F.3d 157, 162 (6th Cir.1996)). "This right of access for prisoners is not unlimited, however; rather, it encompasses only 'a reasonably adequate opportunity to file non-frivolous legal claims challenging their convictions or conditions of confinement.'" *Johnson v. Rodriguez,* 110 F.3d 299, 310–11 (5th Cir. *Ishaaq v. Compton,* 900 F.Supp. 935, 940 (M.D.Tenn.1995) (citing *Smit* 1997) (quoting *Lewis v. Casey,* 518 U.S. 343, 356, 116 S.Ct. 2174, 2182, 135 L.Ed.2d 606 (1996)); *see also Herron,* 203 F.3d at 415 ("This right is protected, however, only if the grievances are not frivolous") (citing *Lewis,* 518 U.S. at 353 n. 3, 116 S.Ct. at 2181 n. 3).[8] Moreover, an

---

**7.** The Defendants also argue that Sarika does not have standing to pursue this appeal, as Reverend Karlen has left his position with the Ohio Department of Rehabilitation and Correction, and Chaplain Hawley has transferred to another institution, rendering his arguments for injunctive relief moot. This argu-

ment is not well taken, as Warden Morgan (who ultimately issued the opinion regarding group worship which is in effect today, and who remains in charge of such final decisions at NCCI) remains a party to this litigation.

**8.** The next sentence of *Herron* goes on to state that "[t]hus Herron's pursuit of legal claims

"inmate cannot immunize himself from adverse administrative action by prison officials merely by filing a grievance or a lawsuit and then claiming that everything that happens to him is retaliatory." *Smith v. Halford,* 570 F.Supp. 1187, 1194–95 (D.Kan.1983); *Ward v. Dyke,* 58 F.3d 271, 274–75 (6th Cir.1995)); *Hall v. Nusholtz,* 234 F.3d 1268 (table), 2000 WL 1679458, at *2 (6th Cir. Nov.1, 2000) (same) (citing *Ishaaq, supra* ). Since the findings made by the court below are "mixed questions of law and fact," this court reviews the instant action *de novo. See Equality Foundation of Greater Cincinnati, Inc. v. City of Cincinnati,* 54 F.3d 261, 265 (6th Cir. 1995), *vacated and remanded on other grounds,* 518 U.S. 1001, 116 S.Ct. 2519, 135 L.Ed.2d 1044 (1996).

## DISCUSSION

As noted previously, an inmate has a constitutional right, protected by the First Amendment, to file nonfrivolous court actions and internal prison grievances. *See Lewis,* 518 U.S. at 356, 116 S.Ct. at 2182; *Thaddeus–X,* 175 F.3d at 391; *Johnson,* 110 F.3d at 310–11; *Herron,* 203 F.3d at 415. The claims do not seem to us to be frivolous, a view buttressed by the fact that one member of the original panel found the claims to be meritorious. Therefore, Sarika has met his burden on the first element of the *Thaddeus–X* test.

The next question "is whether a person of ordinary firmness would be deterred from exercising a right to access the courts by the actions taken against [Sarika]." *Thaddeus–X,* 175 F.3d at 398. Some adverse actions are "so de minimis that they do not rise to the level of being constitutional violations," *id.,* and the "relevant showing in such cases must be more than the prisoner's personal belief that he is the victim of retaliation." *Johnson,* 110 F.3d at 310 (citation omitted). "In the prison context, an action comparable to transfer to administrative segregation would certainly be adverse," as would "[h]arassment, physical threats, and transfer to the area of the prison used to house mentally disturbed inmates" *Thaddeus–X,* 175 F.3d at 396, 398, or the deprivation of prescribed pain medication, *Hall* 2000 WL 1679458, at *2. *See also Cruz v. Beto,* 603 F.2d 1178, 1180 (5th Cir.1979) (inmates segregated into a separate unit, number of inmates per room doubled, access to the commissary reduced, cell searches increased, recreation and educational programs limited, and inmates made ineligible for good time credits unless inmates would agree to drop lawsuits filed by a certain attorney); *Babcock v. White,* 102 F.3d 267, 275 (7th Cir.1996) (finding that blocking an expeditious transfer to protective custody would be an adverse action).

■ Here, the district court determined that the decision to remove the religious items as well as to prohibit any future group meetings of the Buddhists met this standard. Certainly, these actions, if tak-

---

against CCCF officials in the instant case and in previous cases was protected conduct only to the extend that the underlying claims had merit." Citing this passage, the Defendants claim Sarika can state a claim for retaliation only to the extent his underlying claims had merit; and as this court previously dismissed his underlying action, the instant action fails to state a claim under *Thaddeus–X.*

Notwithstanding the passage in *Herron,* the Defendants' argument is in error. The Supreme Court in *Lewis, supra,* spoke only of *frivolous* claims, not non-meritorious claims. There is considerable difference between a claim that is frivolous, which Black's defines as an action that is "groundless ... with little prospect of success; often brought to embarrass or annoy the defendant," Black's Law Dictionary 668 (6th ed.1990), and one that, though colorable, ultimately is found to be without merit.

en in retaliation for engaging in First Amendment-protected activities, meet the "adverse action" standard set forth by this court in *Thaddeus–X.* Such conduct would deter a person of ordinary firmness from attempting to engage in the protected activity in the future.

The district court concluded that Sarika failed meet the third factor of the *Thaddeus–X* test; i.e., the "causal connection between the protected conduct and the adverse action." *Thaddeus–X,* 175 F.3d at 399. The "fact that protected speech may precede an adverse [prison] decision alone does not establish causation," *O'Connor v. Chicago Transit Authority,* 985 F.2d 1362, 1370 (7th Cir.1993), rather, it must be shown that "events would have transpired differently absent the retaliatory motive," *Babcock,* 102 F.3d at 275 (citing *Mount Healthy,* 429 U.S. at 287, 97 S.Ct. at 576). *See also Leary v. Daeschner,* 228 F.3d 729, 737 (6th Cir.2000) ("If the plaintiff makes this showing, the burden then shifts to the defendant to show by a preponderance of the evidence 'that it would have taken the same action even in the absence of the protected conduct.'") (citations omitted).

Here, the evidence contained in the record indicates that the prison officials made the decision to terminate the Buddhists' group meeting privileges and to confiscate the religious artifacts held by Sarika *prior to* learning of his initial lawsuit. Moreover, this court previously determined that both the ban on group meetings and possession of the religious artifacts was permissible due to legitimate penological interests. *See Spies,* 173 F.3d at 404–05 (discussing the rule of five and possession of religious artifacts banned by NCCI). In other words, even if one assumes a partial motivation for the actions taken

against Sarika was his filing of the initial action, the record indicates that the prison officials nevertheless would have imposed the restrictions anyway.[9]

Nevertheless, Sarika argues the continuation of these restrictions, especially the restrictions left in place by Warden Morgan once the Buddhist population met the rule of five, evince retaliation. He argues that the prison officials kept the restrictions in place solely because of pending litigation, which affirmatively demonstrates the causal link under the third *Thaddeus–X* factor. The Defendants argue, and the district court found, that the maintenance of the restrictions stemmed from a desire of the Defendants to maintain the status quo pending the outcome of this litigation. The district court thus concluded no violation of the *Thaddeus–X* test had occurred.

The Defendants also argue that evidence of activities which occurred after the filing of the initial complaint in this action were never properly before the district court although Sarika filed motions to supplement his pleadings to address these activities. They contend that since the district court never actually considered this information as evidence of substantive violations (rather, as noted previously, "post-hoc evidence of retaliatory motive under Fed.R.Evid. 404(b)" to cast light on the actions taken during the time frame outlined in the complaint), this court cannot consider those events in evaluating the instant appeal. Rather, the Defendants contend the court is bound by the decision of the district court not to consider the post-complaint actions as evidence of substantive retaliation by NCCI officials.

---

9. The prior allowances to Sarika for the group meetings and the storage of artifacts were found to be impermissible by Warden Morgan, and he reprimanded Chaplain Hawley for permitting them.

However, when a district court is presented with a motion to supplement under Fed.R.Civ.P. 15(d), it must at the very least issue a ruling on that motion. We have held in regard to Fed.R.Civ.P. 15(a) that "[a]lthough a district court has discretion to deny a motion to amend a complaint after an answer has been filed ... a district court abuses its discretion when it fails to state a basis for its decision to deny a motion to amend." *Rose v. Hartford Underwriters Insurance Co.*, 203 F.3d 417, 420 (6th Cir.2000) (citation omitted). "Given the policy of liberality behind Rule 15(a), it is apparent that when a motion to amend is not even considered, much less not granted, an abuse of discretion has occurred." *Marks v. Shell Oil Co.*, 830 F.2d 68, 69 (6th Cir.1987); *see also Ellison v. Ford Motor Co.*, 847 F.2d 297, 300 (6th Cir.1988). While Sarika moved to supplement his pleadings pursuant to Fed. R.Civ.P. 15(d), the same standard of review and rationale apply. *See McHenry v. Ford Motor Co.*, 269 F.2d 18, 24 (6th Cir. 1959) (stating that denials of Rule 15(d) motions are reviewed for abuse of discretion and noting that courts should "permit amendments freely to cure defective or imperfect pleadings"); *see also Glatt v. Chicago Park District*, 87 F.3d 190, 194 (7th Cir.1996) (holding that the same standard applies for both Rule 15(a) and Rule 15(d) cases).

■ While abuse of discretion by denying a motion to supplement may amount to harmless error if the proposed amendment would not survive a Fed.R.Civ.P. 12(b)(6) motion to dismiss, *see Rose*, 203 F.3d at 420, it is not clear, based on the record before the court, that such would be the case in this action. A motion to dismiss under Rule 12(b)(6) should be granted only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of [his] claims that would entitle [him] to relief." *Kostrzewa v. City of Troy*, 247 F.3d 633, 638 (6th Cir.2001) (citation omitted). In the proposed amendments, Sarika includes allegations that NCCI officials acted to curtail his First Amendment freedoms in retaliation for engaging in protected activity (the filing of this lawsuit). On their face, these allegations appear to meet the three-part test in *Thaddeus–X* for stating a valid retaliation claim. *See Thaddeus–X*, 175 F.3d at 394. In light of these allegations of post-complaint retaliation, Sarika's claim of continuing retaliation was potentially meritorious. Thus, the district court abused its discretion by failing to rule on the motion to supplement the pleadings filed by Sarika, and this matter must be remanded for consideration of, and a ruling upon, the motion to supplement. *See Marks*, 830 F.2d at 69.

## CONCLUSION

For the forgoing reasons, we REVERSE the decision of the district court, and REMAND for proceedings not inconsistent with this opinion.